# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No.   23-CR-3032-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| BRADLEY WINTERS, | |
| Defendant. | |

---

Pro se Defendant Bradley Winters seeks to suppress evidence stemming from his arrest on July 26, 2024.   Docs. 180.   Winters addressed the motion in additional filings.   Docs. 193, 212, 228-1.   The Government resists.   Doc. 203.   I held a hearing on the motion on December 30, 2024 (Doc. 249), and consider the following evidence:

- Testimony from Officer Samantha Pedelty, Clear Lake Police Department.
- Exhibit A (Doc. 258-1) – dispatch reports from Clear Lake Police Department.
- Exhibit B (Doc. 258-2) – officer reports from Clear Lake Police Department.
- Exhibit C – video from Officer Jettika Kober's body camera.
- Exhibit D – video from Officer Pedelty's body camera.
- Testimony from Deputy Frank Hodak, Cerro Gordo County Sheriff's Office (pretrial violation hearing on October 8, 2024) (Doc. 172).

Based on the reasons discussed below, I recommend the district judge deny the motion.


## I.      FACTUAL BACKGROUND

On July 26, 2024, Officer Pedelty responded to a complaint made to dispatch about a motorcycle with high handle bars driving down the middle of the road and swerving in and out of traffic that had parked at Dollar General.   Officer Pedelty went to the Dollar

General and saw two motorcycles parked beside each other—one had high handle bars and the other was dark gray without high handle bars. Officer Pedelty ran the license plates of both motorcycles. The license plate for the dark gray motorcycle came back to a red motorcycle last registered to Gary Winters (the Co-Defendant in this case, referred to as Gary to avoid confusion). Officer Pedelty saw two men start to walk out of the Dollar General, whom she believed to be together. The first man (later identified as the driver of the motorcycle with high handle bars) approached and spoke to Officer Pedelty while the second male "ducked" back inside the store. Officer Pedelty spoke with the first male (he denied being with the second male) and allowed him to leave.

Officer Pedelty received information from dispatch that Winters might be the driver of the second motorcycle (with the plate belonging to Gary) and that he had an active arrest warrant.[1] Officer Pedelty had learned a couple of days prior, through briefings and a bulletin that contained his photograph, that Winters had an active arrest warrant.

Officer Pedelty saw Winters exit the Dollar General approximately two minutes later, having removed a sweatshirt and a hat she had seen him wearing earlier when he ducked back into the store. *See* Ex. D at 6:20. Winters turned away from Officer Pedelty and walked away "briskly" before he started jogging. Based on her experience in law enforcement, Officer Pedelty believed Defendant was trying to evade her.[2]

Winters went around the corner of the building and from there, Officer Pedelty saw him running away. *See* Ex. D at 6:48. She followed him and yelled his name

---

[1] Deputy Hodak heard dispatch provide information about the license plate for Gary Winters. Deputy Hodak knew that Gary Winters was not driving the motorcycle because he was in custody. Deputy Hodak also knew that Defendant had an active arrest warrant and informed dispatch that it might be Defendant driving the motorcycle (and not Gary).

[2] Officer Pedelty later recounted Winters's suspicious behavior. Ex. D at 26:50-27:01.

multiple times but he kept running. Officer Pedelty followed Winters as he ran through a mobile-home park and crossed a fence line before crouching down in a thicket of bushes along the fence line. Officer Pedelty drew her firearm and told Winters to show her his hands and to not move. Winters instead stood up, crossed the fence line, and went back into the mobile-home park. Officer Pedelty followed and tackled Winters to the ground, where she wrestled with him to try and get his hands behind his back.[3] Winters refused Officer Pedelty's commands and when she stood up, Winters ran away from her. Officer Pedelty warned Winters several times that she would spray him with OC[4] spray. Winters stopped, turned around, and stepped toward Officer Pedelty and she sprayed him with OC spray. Winters took off running again and disobeyed Officer Pedelty's commands to stop.

A second officer (Officer Kober) arrived as Winters was going back through the trailer park.[5] Officer Kober saw Officer Pedelty yelling at Winters as he moved away from her. *See* Ex. C at 35:39. Officer Kober got out of her vehicle and yelled for Winters to get on the ground multiple times. Winters turned and said "don't make me shoot you" while his hand was behind his back. Officer Kober drew her taser and Officer Pedelty drew her firearm. They told Winters multiple times to show them his hands and to get on the ground. Winters kept backing away from the officers, saying "I have a gun" with his hand still behind his back. Winters did not follow the officers' commands and started to turn. Officer Kober yelled that he (Winters) had a gun and

---

[3] During the scuffle, it appears Officer Pedelty's body camera fell off of her uniform and remained on the ground until she later retrieved it. Ex. D (from 7:40 to 18:50). By the time Officer Pedelty retrieved her camera, Winters was in custody and other officers were present.

[4] Oleoresin capsicum ("pepper").

[5] Officer Kober's involvement in this incident does not begin until approximately 20:50 into her body camera video (Exhibit C). Her approach of Winters started at approximately 22:30 into the video.

then yelled he did not have a gun. *See* Ex. C at 23:00. Winters took off running, again, and Officer Kober deployed her taser; Winters fell to the ground. *See* Ex. C at 23:10. The officers were still not able to handcuff Winters as he struggled against them. Officer Kober tased Winters additional times, and a third officer and then a fourth officer arrived on scene. Two officers were on top of Winters, who kicked at officers and continued to resist being handcuffed. *See* Ex. C at 27:35 (officer radioing that Winters was "not in custody yet"). After several minutes (and a fourth officer arriving), officers were eventually able to handcuff Winters in front. *See* Ex. C at 27:44.

Officers were concerned Winters had a weapon (in particular a gun in the waistband of his pants), and he continued to actively struggle against the officers even though handcuffed. Officers patted Winters down while he was still prone on the ground, and Officer Pedelty noticed there was something in Winters's crotch area. *See* Ex. C at 28:50. Officers found a black case that was sewn into Winters's pants. *See* Ex. C at 29:30. Officers were eventually able to check the bag and found it contained suspected methamphetamine (later weighed as 109 grams). *See* Ex. C. at 31:00. Officers then rolled Winters over (he continued to yell and struggle) and tried to continue searching his pants area for a weapon. *See* Ex. C at 32:05 (officer telling Winters they were looking for his gun). Officer Pedelty then found a knife in Winters's pants, and an officer also found a used methamphetamine pipe and additional methamphetamine (later weighed as 2 grams) in Winters's pocket. After officers finished searching for weapons, they stood Winters up. *See* Ex. C at 32:42.

Deputy Hodak arrived on the scene and positively identified Winters. After a medical check, Winters was booked into the Cerro Gordo County Jail on the federal arrest warrant and state charges related to resisting arrest and assaulting an officer, as well as drug and paraphernalia charges.

4

## II. DISCUSSION

Winters challenges his seizure, first arguing the officers had no basis to run a license plate check on the gray motorcycle. For purposes of this motion, the court considers as true that the initial complaint of erratic driving involved only the motorcycle with high handle bars (not the gray motorcycle with Gary's license plate), and that the two motorcycles at the Dollar General arrived separately and were not associated together. Winters had no reasonable expectation of privacy in license plates displayed on the gray motorcycle, and thus, Officer Pedelty did not violate any rights by conducting a license plate check.[6]

In addition, officers had reasonable suspicion to stop Winters.

Police may conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime. This standard requires that officers be able to point to specific, articulable facts justifying the seizure. Reasonable, articulable suspicion for a Terry stop requires less than probable cause of criminal activity, but the suspicion cannot be based on an "inarticulate hunch[ ]." The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience.[7]

In this case, Officer Pedelty saw Winters duck back into the Dollar General. She then saw him leave the store, walk briskly, and then jog away from her around the corner of the building. From there, she saw Winters running away from the area. Winters did not stop despite Officer Pedelty yelling his name multiple times. This behavior

---

[6] *See United States v. Sparks*, 37 F. App'x 826, 829 (8th Cir. 2002) (an officer running the license plate of parked vehicle "has no impact whatsoever on the rights of the driver, as no person possesses a privacy interest in their license plates"); *see also United States v. Cowan*, 674 F.3d 947, 955 (8th Cir. 2012) (finding the defendant had no reasonable expectation of privacy in the identity of his car based on "diminished expectation of privacy in vehicles" and fact that vehicles travel in public and their contents are often visible to plain view).

[7] *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (citations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)).

5

provided reasonable suspicion to stop Winters.[8]   In addition, by the time Winters left the Dollar General and walked away (before running and failing to stop), Officer Pedelty believed he was in fact Winters, whom she knew had an active arrest warrant.   Once officers positively identified Winters, they had probable cause to arrest based on the active arrest warrant.[9]

The officers could also search Winters for weapons.   An officer's reasonable belief that a "detained individual may be armed and dangerous [allows for] a pat-down search for weapons to ensure officer safety."[10]   The officer need not be certain the suspect has a weapon, only reasonably believe under the circumstances that the safety of the officer or others is in danger.[11]   Here, Winters told officers he had a firearm, put his arm in the small of his back as if he had a firearm, and continued to physically resist officers even after handcuffed.   Based on this, the officers reasonably believed

---

[8] ***Horton***, 611 F.3d at 939-40 (finding reasonable suspicion to stop defendant after he matched description of person engaging in strange behavior and he "briskly walked away" when he saw approaching police vehicle before quickly entering building and immediately leaving upon finding interior door was locked); *see also* **United States v. Hightower**, 716 F.3d 1117, 1120-21 (8th Cir. 2013) (finding defendant ignoring officers commands to stop and attempting to flee supported reasonable suspicion to stop defendant; "Although simply ignoring the police cannot be a basis for reasonable suspicion, conduct beyond merely ignoring, such as attempting to flee, can create reasonable suspicion to support a *Terry* stop." (quoting **United States v. Gillam**, 520 F.3d 844, 847 (8th Cir. 2008))).

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citations omitted).

[9] Federal Rule of Criminal Procedure 4(a) requires probable cause to issue an arrest warrant.

[10] ***Horton***, 611 F.3d at 940-41.

[11] ***Id.*** at 941.

6

Defendant could have a firearm or other weapon in his pants, which he could have reached even while handcuffed in the front of his body, and that he presented a danger. Officers acted reasonably in stopping and patting Winters down on July 26, 2024.

### III.  CONCLUSION

I recommend **DENYING** Defendant's motion to suppress (Doc. 180).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections.   A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.   Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.   Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.

The Clerk of Court will provide a copy of this order to pro se Defendant.

**ENTERED** on January 31, 2025.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa